UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

JOHN ARETAKIS,

                         Plaintiff,

                         v.

CAESARS ENTERTAINMENT, RIO SECCO
GOLF CLUB, CAESARS ENTERTAINMENT
OPERATING COMPANY, CAESARS PALACE,
BUTCH HARMON, MILLIONAIRE MAKER,
and NIKE GOLF,

                      Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 23, 2018

16 Civ. 8751 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      This dispute stems from a Las Vegas golf contest that allegedly offered the opportunity to win a $1 million prize by making a hole-in-one (the "Hole-in-One Contest" or the "Contest"). Plaintiff John Aretakis paid for himself and three of his colleagues to compete in the Contest; as fate would have it, one of his colleagues made a hole-in-one. As fate would also have it, the rules of the Contest had fine print: a participant who made a hole-in-one won only the right to return to Las Vegas to compete in a *second* hole-in-one competition before winning the $1 million prize. Plaintiff balked and, after his golf-adept colleague sought to assign any rights he had in the prize to Plaintiff, Plaintiff filed the instant suit against a number of entities he alleged to be complicit in a hole-in-one fraud.

The named defendants include Caesars Entertainment Corporation, incorrectly named as "Caesars Entertainment"; Caesars Entertainment Operating Company; Desert Palace, Inc., doing business as Caesars Palace (collectively, the "Caesars Defendants"); and Rio Development Company, incorrectly named as Rio Secco Golf Club (with the Caesars Defendants, "Defendants"). The Amended Complaint also lists three defendants that Plaintiff identified as appearing on promotional materials for the Hole-in-One Contest: Butch Harmon, Millionaire Maker, and Nike Golf. Before the Court is Defendants' motion to dismiss the Amended Complaint. For the reasons that follow, the Court grants the motion.

<h1 style="text-align:center">BACKGROUND[1]</h1>

**A.  Factual Background**

**1.  The Hole-in-One Contest**

Despite Plaintiff's sprawling, 370-paragraph Amended Complaint, the facts he alleges are fairly straightforward: On January 31, 2016, while on a business trip, Plaintiff and three acquaintances, including Adam Neary, played

---

[1]     The Court draws the facts in this section from the Amended Complaint ("Am. Compl." (Dkt. #38)), along with certain documents submitted by Defendants in connection with the instant motion, as discussed more fully below. For convenience, the Court refers to Defendants' Memorandum of Law in Support of the Motion to Dismiss the Amended Complaint as "Def. Br." (Dkt. #44), and Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss as "Pl. Opp." (Dkt. #45-1). The Court also refers to the Declaration of William A. Lesser in Support of the Motion to Dismiss the Amended Complaint ("Lesser Decl." (Dkt. #42)), and its attached exhibits, namely, a purported assignment agreement between Adam Neary and Plaintiff ("Neary Assignment" (Dkt. #42-1)), an article entitled, "Million Dollar Hole In One at Las Vegas Golf Course Rio Secco Going Big" (the "Article" (Dkt. #42-2)), and a printout of the rules applicable to the Hole-in-One Contest ("Contest Rules" (Dkt. #42-3)). Finally, the Court refers to the Affidavits of Plaintiff and Adam Neary in Opposition to the Motion to Dismiss, respectively, as "Pl. Aff." (Dkt. #45) and "Neary Aff." (Dkt. #45-2).

a round of golf at the Rio Secco Golf Club in Las Vegas, Nevada.  (Am. Compl.

¶¶ 5-6, 59).  At the seventh hole, "a young woman working for Rio Secco"

informed the group that for a $20 fee, a golfer could enter the "million-dollar

hole-in-one challenge," in which a golfer who hits a ball from the tee to the cup

in one swing "would get … a million-dollar prize."  (*Id.* at ¶¶ 60, 66).  Plaintiff

also noticed an eight- to ten-foot sign near the seventh hole reading, "Welcome

to the Rio Secco [M]illion-[D]ollar [H]ole."  (*Id.* at ¶ 66).  Thereafter, "Plaintiff

paid the $20 entry fee for all [four] golfers."  (*Id.* at ¶ 69; *see also id.* at ¶ 67

(alleging that Plaintiff "paid the young woman $80 … for each of the entire

foursome's entry in the hole-in-one challenge")).

   After Plaintiff paid the entry fees but before Neary attempted to swing,

Neary offered to reimburse Plaintiff for the $20 entry fee or to give "Plaintiff a

half interest in the contest and the million-dollar hole-in-one prize."  (Am.

Compl. ¶ 69; *see id.* at ¶¶ 70-71).  Plaintiff accepted Neary's offer for "50% of

the million-dollar prize," if Neary succeeded  (*Id.* at ¶ 70).  Sure enough, Neary

made a hole-in-one.  (*See id.* at ¶¶ 61, 75, 107).  Plaintiff further alleges that

after Neary made the shot but before he and Neary had verified that the ball

landed in the cup, "Neary again confirmed [Plaintiff's] 50% interest" in the

million-dollar prize.  (*Id.* at ¶ 82).  The Rio Secco employee working at the

seventh hole then confirmed that the ball had landed in the cup.  (*Id.* at ¶ 108).

   The foursome's celebration was short-lived; the Rio Secco employee told

Plaintiff that he and Neary "do not get the million dollars, you only win an

all-expense paid trip back to Las Vegas to compete in a competition at Rio

Secco to try to win the $1 million." (Am. Compl. ¶ 109). A few holes later, another Rio Secco employee working at a drink cart referred to the contest as "kind of a bait and switch," because it leads golfers "to think that a hole-in-one gets [the golfer] the million dollars." (*Id.* at ¶ 111). After the foursome completed the golf round, Neary was presented with a four-to-five-foot $1 million novelty check. (*Id.* at ¶ 112). The check bore apparent endorsements from "Millionaire Maker," "Butch Harmon," "Petron Tequila," and "Nike Golf." (*Id.*).

## 2. The Fine Print

Plaintiff contends that after Neary made the shot, "the Defendants" — presumably Rio Secco employees — directed Plaintiff and Neary to the rules printed on Rio Secco's website, which rules provide that a golfer who participates in the Hole-in-One Contest and makes a hole-in-one at the seventh hole would win "an all-expense paid return trip with a companion back to Las Vegas in November 2016 to compete in a hole-in-one challenge with Butch Harmon (Tiger Woods' former golf swing coach), and other [participants] who got a hole-in-one on the [seventh] hole in 2016." (Am. Compl. ¶ 113).

In connection with this motion, the Court has reviewed printouts from Rio Secco's website of the rules applicable to the Hole-in-One Contest (the "Contest Rules" or the "Rules").[2] One section, entitled "Entry," provides that "[p]articipation in [the] Rio Secco $1,000,000 Hole Main Event [is] secured

---

[2]     Defendants submitted these printouts as an attachment to their motion to dismiss. The Court will discuss more fully *infra*, its ability to consider the various materials submitted by the parties in connection with the motion to dismiss.

through: a) witnessed hole-in-one at Rio Secco on hole #7 (witness must be designated Rio Secco team employee, specifically assigned to witness hole #7 during predetermined schedule)"; or "b) random drawing conducted monthly during promotion period by Rio Secco management." (Contest Rules). A separate provision, entitled "Rio Secco $1,000,000 Hole Prizes," reads as follows:

- Each verified winner of the monthly drawing, and any person with qualified hole-in-one during the promotion period will receive the following prizes: three (3) night stay (room and tax only) at a casino resort affiliate of Rio Secco to be determined by Rio Secco, two rounds of (18) holes of golf at Rio Secco and/or Cascata, tee gift, round trip ground transportation from McCarran International Airport to the casino resort, from the casino resort to the golf courses, and from the casino resort to the event site.

- Rio Secco $1,000,000 Main Event will be comprised of each player hitting (3) single golf shots with USGA approved equipment from a distance of 175 yards on hole #7 at Rio Secco, at a time determined by Rio Secco event management, with a $1,000,000 prize awarded for each hole-in-one on said shots.

- Each $1,000,000 prize awarded in 20-year annuity — $50,000 each year for 20 years.

(*Id.*).

Plaintiff contends that in addition to the prizes listed on the website, a golfer who prevails in the Hole-in-One Contest would also receive a $500 credit at the Rio Secco golf shop. (*See* Am. Compl. ¶ 113 ("[T]he hole-in-one recipient[] would get a $500 Pro shop credit[] (that was in fact not on the website)[.]")). And, indeed, the Amended Complaint recites that on January 31, 2016, "Neary and the Plaintiff were given the $500 Pro shop credit," which

Plaintiff believed to be a "bait and switch." (*Id.* at ¶ 211).  More specifically, Plaintiff alleges that the $500 credit "appear[ed] to be a gratuitous ruse in a series of conflicting and/or alternative prizes given by the Defendants in order to placate a disgruntled golfer who gets a hole-in-one" that would allow Defendants "to refuse or argue [that] a one million-dollar debt is not owed by the Defendants." (*Id.* at ¶ 114).  Ruse or not, "Plaintiff and Neary … used [the credit] at the end of the round[.]" (*Id.* at ¶ 92).

In March 2016, "Caesars and Rio Secco" called Neary to inform him that the companies had rescheduled the second round of the Hole-in-One Contest from November 2016 to June 2016.  (Am. Comp. ¶ 140).  Neary received another call "in late March or early April 2016" informing him that "because Caesars or Caesars Palace or the Caesars corporate entity" was entering bankruptcy, the company "had to cancel or postpone the all-expense paid return to Las Vegas" for the Hole-in-One Contest.  (*Id.* at ¶ 141).

### 3.  Neary's Attempted Assignment

Soon thereafter, on May 2, 2016, Neary executed a document purporting to assign to Plaintiff "the entire claim and rights to the million dollars, the million-dollar hole-in-one challenge, and the prizes associated therewith." (Am. Compl. ¶ 142).  The document is entitled "Assignment of Rights," and claims to "assign [Plaintiff] all of [Neary's] claims, judgments, complaints, actions, and prizes and/or settlements" against "Caesars and Rio Secco (and all other possible Defendants involved)" stemming from Neary's participation in the Hole-in-One Contest.  (Neary Assignment 1-2).  The Assignment further recites

6

that the day after the round of golf, Neary "agreed to assign all [his] rights, including the right to collect any money from or file a legal action against Rio Secco and Caesars to [Plaintiff]," and that Plaintiff "said he would go back to the course to further investigate." (*Id.* at 1). Neary explained his desire to assign his rights to Plaintiff because he "did not want to be further upset and distracted with such a drastic and misleading event, and colossal rip-off." (*Id.*). The document also provides that Neary made the assignment in exchange "for One ($1.00) Dollar and other good and valuable consideration" (*id.* at 2); Plaintiff clarifies in his submissions to the Court that "this is standard, legal boilerplate that serves to support an assignment, and nothing else," and, more particularly, that it is "not evidence of the purchase of a legitimate debt for a considerable sum of money" (Pl. Opp. 8).

Plaintiff alleges that because Neary had already agreed to give Plaintiff half of his winnings before making the shot, this later assignment served the dual purposes of memorializing that preexisting exchange and transferring to Plaintiff the remainder of the right to those winnings. (*See* Am. Compl. ¶¶ 186-91, 217). Plaintiff thus asserts that he is not prosecuting the instant suit "for, or on behalf of [Neary], but because [Neary] has [two] young children, and [due to] the stress of his career, and the anxiety, annoyance, frustration and upset caused by these events, [he] decided to extricate himself from these events and assign in totality to [Plaintiff] Neary's interests in this debt." (*Id.* at ¶ 218).

### 4. Defense Counsel's Alleged Contact with Neary

Finally, Plaintiff alleges that after filing this lawsuit but before amending his complaint, on or about January 11 and 12, 2017, one of Defendants' lawyers contacted Neary in an "attempt to settle the case by having [Neary] change his testimony or breach the assignment." (Am. Compl. ¶ 366; *see id.* at ¶ 345). Specifically, the offer was for Neary "to settle, resolve and[/]or end the case if [he] accepted an all[-]expense paid trip to Las Vegas for [two] people, and for [Neary] to hit [three] shots at the 7th green, and to possibly win $1 million [] with a [second] hole[-]in[-]one." (*Id.* at ¶ 352). In Plaintiff's estimation, the attorney's conduct amounted to tortious interference with his rights.

## B. Procedural History

Plaintiff filed his initial complaint in this action in the Supreme Court of New York, New York County, on or about October 6, 2016, seeking $1,000,000 in damages. (Dkt. #1). On November 10, 2016, Defendants removed the action to federal court on the basis of diversity jurisdiction. (*Id.*). On December 8, 2016, Plaintiff moved to remand the case to state court (Dkt. #13), but after Defendants opposed the motion (Dkt. #21), Plaintiff withdrew the remand motion (Dkt. #25).

On December 16, 2016, Defendants requested a conference in anticipation of filing a motion to dismiss the complaint. (Dkt. #17). The Court held such conference on February 1, 2017, during which the Court granted leave for Plaintiff to amend his complaint and scheduled briefing for a motion

to dismiss after Plaintiff amended his complaint.  (*See* Dkt. #33).  Accordingly,

Plaintiff filed his Amended Complaint on March 15, 2017.  (Dkt. #38).

The Amended Complaint includes six claims:

- A claim for fraud based on a "Rio Secco employee advis[ing] the Plaintiff, [Neary,] and their group that entering the [Hole-in-One Contest] and paying the $20 entry fee would get the golfer the one million-dollar prize should they get a hole-in-one."  (Am. Compl. ¶ 244).

- A claim for negligence based on Defendants "improperly training and supervising their employees[,] giving inaccurate information to the public and to the Plaintiff, and carelessly marketing the [Hole-in-One Contest]." (*Id.* at ¶ 279).

- A claim for breach of contract, on the theory that Defendants entered into a contract with Neary under which Neary was entitled to $1 million for making a hole-in-one, which contract Neary then assigned to Plaintiff.  (*See id.* at ¶¶ 287-311).

- A claim for "intentional and material misrepresentations to the Plaintiff and [Neary] regarding the [Hole-in-One Contest]," consisting of Defendants stating "that a hole-in-one got the Plaintiff and [Neary] a one million-dollar prize."  (*Id.* at ¶¶ 314-15).

- A claim for injunctive relief "against the Defendants … to stop [them] from presently soliciting and taking the $20 fee from patrons" for the Hole-in-One Contest; to compel unspecified "Co-Defendants [to] remove their names and sponsorship of this fraudulent activity while this case is pending";[3] "to compel the Defendants to change [their] marketing and advertising to the public";

---

[3]     The Court assumes the "Co-Defendants" to which Plaintiff is referring are Butch Harmon, Millionaire Maker, and Nike Golf.  Defendants' motion asserts that Butch Harmon and Nike Golf have retained counsel but have not yet received proper service (*see* Def. Br. 7 n.5), and Defendants' Notice of Removal further provides that "Millionaire Maker is not a person, business entity or organization" (Dkt. #1 at ¶ 11).  Plaintiff does not dispute these deficiencies in service or pleading.  Accordingly, under Federal Rule of Civil Procedure 4(m), the matter is subject to dismissal without prejudice as to those Defendants.

and to "stop the Defendants, or their agents[,] from making or discussing offers of settlement or things of substantial value to [Neary], and/or any other witnesses." (*Id.* at ¶¶ 323-24, 328, 333).[4]

- Finally, a claim for tortious interference with the putative contractual relationship between Neary and Plaintiff, arising from the January 2017 interaction between Neary and Defendants' counsel. (*See id.* at ¶¶ 344-70).

Defendants filed the instant motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) on April 7, 2017 (Dkt. #41-44); Plaintiff opposed the motion on May 8, 2017 (Dkt. #45); and Defendants filed their reply on May 22, 2017 (Dkt. #46).

## DISCUSSION

### A.   Motions to Dismiss Under Rule 12(b)(6)

#### 1.   Legal Standard

When considering a motion to dismiss under Rule 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v.

---

[4]     Plaintiff has not applied for temporary or preliminary injunctive relief.

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### 2. Plaintiff's *Pro Se* Status

Although Plaintiff is proceeding *pro se*, he was once a practicing lawyer. (*See, e.g.*, Pl. Opp. 5). He therefore is not entitled to the solicitude that courts often afford *pro se* litigants. *See Colliton* v. *Bunt*, 709 F. App'x 82, 83 (2d Cir. 2018) (summary order) (observing that where a plaintiff "is a former lawyer, he [or she] is not entitled to any special solicitude as a *pro se* litigant" (citing *Tracy* v. *Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) ("[T]he degree of solicitude may be lessened where the particular *pro se* litigant is experienced in litigation and familiar with the procedural setting presented."))); *accord United States* v. *Pierce*, 649 F. App'x 117, 118 n.1 (2d Cir. 2016) (summary order)

(denying special solicitude to *pro se* litigant who was disbarred attorney), *cert. denied sub nom. Abakporo* v. *United States*, 137 S. Ct. 841 (2017).

### 3. The Court's Consideration of Documents External to the Complaint

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). "To be integral to a complaint, the plaintiff must have [i] 'actual notice' of the extraneous information and [ii] 'relied upon th[e] documents in framing the complaint.'" *DeLuca* v. *AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (last alteration in original) (quoting *Chambers*, 282 F.3d at 153).

"Merely mentioning a document in the complaint will not satisfy this standard," and the exception often applies where "the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason — usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim — was not attached to the complaint." *Goel* v. *Bunge, Ltd.*,

820 F.3d 554, 559 (2d Cir. 2016) (quoting *Global Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)). Moreover, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity[, relevance,] or accuracy of the document." *DiFolco*, 622 F.3d at 111 (quoting *Faulkner* v. *Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

The parties have submitted a number of documents along with their briefing on the motion to dismiss. Defendants have submitted with the Declaration of William A. Lesser the following attachments: (i) a copy of the purported assignment between Plaintiff and Neary; (ii) a copy of an article to which the Amended Complaint ostensibly refers; and (iii) a copy of the rules for the Hole-in-One Contest as presented on Rio Secco's website. (*See* Lesser Decl. ¶¶ 2-4). For his part, Plaintiff has submitted, in conjunction with his opposition brief, a 29-page, 127-paragraph affidavit from himself and a separate 16-page, 79-paragraph affidavit from Neary. (*See* Pl. Aff.; Neary Aff.).

With respect to the documents submitted by Defendants, the Court may properly consider the Contest Rules and the Neary Assignment, but not the Article. In an effort to persuade the Court not to consider these documents, Plaintiff argues that "Defendants submit [two] exhibits[] dated [four] years prior to the" events at issue, but does not explicitly state the precise documents to which he is referring. (Pl. Opp. 19). The purported assignment is dated May 2, 2016 (Neary Assignment 3), thus post-dating the events in question, and the Court therefore presumes that Plaintiff is referring to the Article and the

Contest Rules.  Although the Article is indeed dated February 19, 2012, the text of the Contest Rules does not provide a date.  What is more, the print information on the bottom of the Contest Rules shows a printing date of April 7, 2017.  Although the Article may, in fact, be the same article referenced in the Amended Complaint, given the discrepancy between its date and the date of the events in question, Plaintiff has raised a genuine dispute as to the Article's relevance.  Plaintiff's analogous argument regarding the Contest Rules is unpersuasive, however, given their apparent printing date, and Plaintiff raises no objection to the authenticity or relevance of the Neary Assignment.  The Court shall therefore consider those two documents.  *See DiFolco*, 622 F.3d at 111.

The Court may not, however, consider the affidavits Plaintiff has submitted.  They were neither attached to the Amended Complaint nor referenced therein.  And because Plaintiff included them in opposition to Defendants' motion, the affidavits are far from integral to the pleadings — indeed, Defendants had no notice of them until after moving to dismiss.  *See DeLuca*, 695 F. Supp. 2d at 60.

## B.    **Plaintiff's Breach of Contract Claim Fails**

Plaintiff's breach of contract claim is predicated on his allegations that (i) Plaintiff and Neary entered into a contract with the Caesars Defendants that entitled them to $1 million dollars if either of them made a hole-in-one; (ii) before Neary shot for the hole-in-one, Plaintiff accepted Neary's offer of half of the prize if Neary made the shot, and thereby created an oral contract with

Neary; and (iii) after Neary made the shot, he assigned to Plaintiff the
remainder of his interest in the prize in a written agreement. As detailed in the
remainder of this section, the claim fails on multiple grounds.

### 1. Neary's Pre-Shot Offer Lacked Consideration

The first deficiency in the putative contract between Neary and Plaintiff is
that Neary's oral pre-shot offer lacked consideration.[5] "A valid contract under
New York law requires the familiar elements of offer, acceptance, consideration,
mutual assent, and an intent to be bound." *Stone* v. *Sutton View Capital, LLC*,
No. 17 Civ. 1574 (VEC), 2017 WL 6311692, at *4 n.7 (S.D.N.Y. Dec. 8, 2017)
(citing *Register.com, Inc.* v. *Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)).
Consideration requires more than a simple cash exchange: it requires "either a
benefit to the promisor or a detriment to the promisee." *Weiner* v. *McGraw-Hill,
Inc.*, 57 N.Y.2d 458, 464 (1982); *see Genger* v. *Genger*, 663 F. App'x 44, 49 (2d

---

[5]     A federal court sitting in diversity applies the choice-of-law rules of the state in which it
sits. *See In re Gawker Media LLC*, 571 B.R. 612, 626 (Bankr. S.D.N.Y. 2017) (quoting
*Liberty Synergistics Inc.* v. *Microflo Ltd.*, 718 F.3d 138, 151 (2d Cir. 2013)). Because
both parties' briefing relies on New York law and neither party disputes its applicability,
the Court shall apply New York law. *Celle* v. *Filipino Reporter Enters. Inc.*, 209 F.3d 163,
175 (2d Cir. 2000) ("Since no party has challenged the choice of New York [] law, all are
deemed to have consented to its application.").

In addition, as Defendants note, the laws of New York and Nevada (a potentially
alternative forum) are not in conflict on the issues relevant to this motion. (*See, e.g.*,
Def. Br. 15). A federal court applying New York's choice-of-law rules may apply New
York law where it is not "fundamentally dissimilar" from that of the alternative forum.
*Seven-Up Bottling Co. (Bangkok)* v. *PepsiCo, Inc.*, 686 F. Supp. 1015, 1022 (S.D.N.Y.
1988); *accord Nwanza* v. *Time, Inc.*, 125 F. App'x 346, 348 n.1 (2d Cir. 2005) (summary
order) (applying New York law where it presented "no substantive difference" with
Pennsylvania law); *Secured Capital De Mexico, S. De R.L. De C.V.* v. *Midland Credit Corp.*,
No. 02 Civ. 2434 (AGS), 2003 WL 68042, at *3 (S.D.N.Y. Jan. 7, 2003) ("If there is no
material difference between the relevant laws of the particular jurisdictions, the Court
need not engage in a choice of law analysis and can apply New York law." (citations
omitted)). Accordingly, the Court notes below how Nevada law aligns with New York law
and further supports the Court's conclusions.

Cir. 2016) (summary order) (quoting *Hollander* v. *Lipman*, 885 N.Y.S.2d 354 (2d Dep't 2009)). "The promise and the consideration must purport to be the motive each for the other, in whole or at least in part. It is not enough that the promise induces the detriment or that the detriment induces the promise if the other half is wanting." *Allegheny Coll.* v. *Nat'l Chautauqua Cty. Bank of Jamestown*, 246 N.Y. 369, 373 (1927) (quoting *Wis. & Mich. Ry. Co.* v. *Powers*, 191 U.S. 379, 386 (1903)).

Plaintiff argues that Neary's pre-shot offer of half of his winnings was in exchange for the $20 entry fee to the Hole-in-One Contest that Plaintiff had paid for each member of their party. (*See* Pl. Br. 7-8 ("The exchange of the first one[-]half interest in the prize is and was a logical arm's-length transaction and since [Neary] did not pay back the $20 entry fee, the parties confirmed and reconfirmed their oral agreement both immediately before, and immediately after the shot.")). Significantly, however, this argument conflates Plaintiff's payment of the entry fees with Neary's oral offer. The Amended Complaint states that Plaintiff paid for "each of the entire foursome's" entry fee so that each could "attempt to get a hole-in-one"; after that payment, but "before [Neary] hit the shot, [he] indicated … that he would either pay [Plaintiff] the $20 back, or instead would give the plaintiff a half interest in the contest and the million-dollar hole-in-one prize." (Am. Compl. ¶¶ 67, 69). In other words, when Neary made his offer, Plaintiff had already paid Neary's $20 entry fee; Neary's offer thus was supported not by valid consideration, but rather by invalid "past consideration." *Umscheid* v. *Simnacher*, 482 N.Y.S.2d 295, 297

(2d Dep't 1984) ("The general rule is that past consideration is not consideration[.]  A promise supported by past consideration is unenforceable because the detriment did not induce the promise." (quoting *Citibank, Nat'l Ass'n* v. *London*, 526 F. Supp. 793, 803 (S.D. Tex. 1981) (construing New York law))).[6]

To be sure, New York law recognizes past consideration as valid consideration in certain circumstances — as, for example, a "promise in writing and signed by the promisor … if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed." *Umscheid*, 482 N.Y.S.2d at 297 (quoting and discussing N.Y. Gen. Oblig. Law § 5-1105).  This exception to the general rule, however, requires that the writing "contain an unequivocal promise to pay a sum certain, at a date certain, and must express consideration for the promise." *Id.*  Plaintiff and Neary mention the purported oral contract in the May 2016 Assignment of Rights, but that document states that the assignment it attempts to accomplish is "in addition to" the previous exchange.  (Neary Assignment 1).  Moreover, the document does not list the $20 entry fee as the valid consideration underlying the assignment.  The

---

[6]    Nevada contract law would command the same outcome.  *See Clark Cty.* v. *Bonanza No. 1*, 96 Nev. 643, 650 (1980) ("A benefit conferred or detriment incurred in the past is not adequate consideration for a present bargain."  (citing *Smith* v. *Recrion Corp.*, 91 Nev. 666, 669 (1975) ("Past consideration is the legal equivalent to no consideration."))); *see also Jones* v. *SunTrust Mortg., Inc.*, 128 Nev. 188, 191 (2012) ("Consideration is the exchange of a promise or performance, bargained for by the parties."  (citing *Pink* v. *Busch*, 100 Nev. 684, 688 (1984))).

document therefore does not save Plaintiff's alleged oral contract from failing

for lack of consideration.[7]

---

[7]    Although not fatal to Defendants' motion, the Court rejects Defendants' ratification argument. Defendants characterize the Amended Complaint as "alleg[ing] that Defendants offered, and [Neary] accepted, an oral agreement under which he would win $1,000,000 for a $20 entry fee and a hole-in-one," but that "Defendants changed those terms after [Neary] hit his hole-in-one" and instead offered "a $500 golf shop credit and an opportunity to attend the Main Event." (Def. Br. 12-13). Defendants thus contend that Neary ratified his contract with Defendants under those modified terms. (*See id.* at 11-15). "'Ratification' results when a party to a voidable contract accepts benefits flowing from the contract, or remains silent, or acquiesces in [the] contract for any considerable length of time after he has opportunity to annul or void the contract." *Prudential Ins. Co. of Am.* v. *BMC Indus., Inc.*, 630 F. Supp. 1298, 1300 (S.D.N.Y. 1986) (citation omitted)).

Defendants' argument disregards the allegation that Neary never received a second trip to Rio Secco, its associated amenities, or the concomitant opportunity to shoot a second hole-in-one to win $1 million. (*See* Am. Compl. ¶¶ 140-41). To hold that a party ratifies a contract by accepting only a small portion of the contract's benefits would paint ratification doctrine with too broad a brush. Indeed, many of the cases on which Defendants rely support the notion that to be effective, ratification requires a party to accept, if not all, at least a substantial portion of the benefits of the purported contract. *See, e.g., H & H Acquisition Corp.* v. *Fin. Intranet Holdings*, 669 F. Supp. 2d 351, 360-61 (S.D.N.Y. 2009) (holding plaintiff ratified settlement agreement where defendant "*fully complied* with his obligations under the settlement agreement" (emphasis added)); *Beutel* v. *Beutel*, 55 N.Y.2d 957, 958 (1982) (holding plaintiff ratified agreement where plaintiff was competent for "two years during which the contract was effective and *fully performed*" (emphasis added)); *Palumbo* v. *Norstar Bank Upstate N.Y.*, 622 N.Y.S.2d 263, 263-64 (1st Dep't 1995) (holding plaintiffs ratified agreement where the agreement was "effective for years before the action was commenced [and] *fully performed*," and "plaintiffs accepted its benefits" (emphasis added)); *McLean* v. *Balkoski*, 509 N.Y.S.2d 34, 36 (1st Dep't 1986) (holding plaintiff ratified marital separation agreement where she "accepted support payments from defendant for over six years without raising any objections and received 80% of the proceeds of the sale of their cooperative apartment pursuant to the terms of the agreement").

Defendants rely in large part on *Nirvana International, Inc.* v. *ADT Security Services, Inc.*, 881 F. Supp. 2d 556 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 12 (2d Cir. 2013) (summary order). There, the plaintiff jewelry store was burglarized and the alarm system installed by the defendant security company failed to activate; the plaintiff then sought damages from the security company for approximately $2.4 million in losses. *Id.* at 557-60. In response, the security company pointed to a provision in the contract between the parties limiting its liability to $1,000; the plaintiff claimed, however, that the store's owner did not sign the page of the contract containing the liability limitation and that the company's version of the contract reflecting such signature was a forgery. *Id.* at 559-60. Taking the plaintiff's allegations as true and assuming that the signature was forged, the court nevertheless held that the plaintiff had ratified the contract and all of its terms by "accept[ing] the benefits of Defendant's performance by allowing Defendant to install the alarm system." *Id.* at 561. Here, in sharp contrast, Neary only obtained a relatively insignificant portion of the benefits flowing from the purportedly modified contract, i.e., the $500 shop credit but not the return trip to Las Vegas. Moreover, even if the Court accepted Defendants' ratification argument, Defendants would not have

## 2. Neary's Post-Shot Assignment Was Champertous and Is Thus Void

Having determined that the alleged oral contract between Neary and Plaintiff fails for lack of consideration, the Court next considers the validity *vel non* of Neary's May 2016 assignment to Plaintiff. Defendants contend that the purported assignment contravenes the prohibition on champerty, i.e., purchasing a claim for the purpose of bringing suit. The Court agrees.

The "medieval" doctrine of champerty developed to battle the ills associated with the commodification of litigation. *Tr. for the Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc.* v. *Love Funding Corp.*, 13 N.Y.3d 190, 198 (2009). "Champerty, as a term of art, grew out of the practice where someone bought an interest in a claim under litigation, agreeing to bear the expenses but also to share the benefits if the suit succeeded." *Taylor-Burns* v. *AR Res., Inc.*, 268 F. Supp. 3d 592, 597 (S.D.N.Y. 2017) (quoting *Justinian Capital SPC ex rel. Blue Heron Segregated Portfolio* v. *WestLB AG*, 952 N.Y.S.2d 725, 731 (N.Y. Sup. Ct. 2012)), *appeal withdrawn*, No. 17-2472, 2017 WL 5495506 (2d Cir. Nov. 6, 2017). Champerty statutes are designed to "prevent[] the 'strife, discord and harassment' that would be likely to ensue" from trading in claims for the purpose of bringing suit. *Love Funding Corp.*, 13 N.Y.3d at 199 (quoting *Fairchild Hiller Corp.* v. *McDonnell Douglas Corp.*, 28 N.Y.2d 325, 329 (1971)).

New York has codified the prohibition on champerty in Judiciary Law § 489(1), which "restricts individuals and companies from purchasing or taking

---

fully performed under the terms of the ratified agreement, and thus could still be liable under its terms.

an assignment of notes or other securities 'with the intent and for the purpose of bringing an action or proceeding thereon.'" *Justinian Capital SPC* v. *WestLB AG*, 28 N.Y.3d 160, 166 (2016) (quoting § 489(1)). The New York Court of Appeals has clarified that the prohibition applies where "the *primary purpose*" of a transaction is "to enable [the purchaser] to bring a suit, and the intent to bring a suit must not be merely incidental and contingent." *Id.* at 166-67 (quoting *Moses* v. *McDivitt*, 88 N.Y. 62, 65 (1882)). This analysis distinguishes "between acquiring a thing in action in order to obtain costs and acquiring it in order to protect an independent right of the assignee, with only the former being champertous." *Universal Inv. Advisory SA* v. *Bakrie Telecom PTE, Ltd.*, 62 N.Y.S.3d 1, 8-9 (1st Dep't. 2017) (internal quotation marks and citation omitted) (quoting *Love Funding Corp.*, 13 N.Y.3d at 199).[8] Thus, an assignment of rights is not champertous "if its purpose is to collect damages, by means of a lawsuit, for losses on a debt instrument *in which it holds a preexisting proprietary interest.*" *Love Funding Corp.*, 13 N.Y.3d at 195 (emphasis added).[9]

---

[8]  Champerty is not limited to circumstances where a party, and more specifically a lawyer, purchases a claim in order to secure "costs." *Justinian Capital SPC* v. *WestLB AG*, 28 N.Y.3d 160, 167 n.3 (2016). The language in cases referring to efforts to secure costs "hark[ens] back to earlier cases, from before 1907, when 'the prohibition of champerty was limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs, *which, at the time, included attorneys' fees.*'" *Id.* (quoting *Bluebird Partners* v. *First Fid. Bank*, 94 N.Y.2d 726, 734 (2000)). The New York Court of Appeals has made clear that the champerty law applies with equal force to entities that would not obtain such fees by bringing suit. *Id.*

[9]  Nevada also prohibits champerty and cabins the prohibition in a similar fashion, though on common law rather than statutory grounds. *See Schwartz* v. *Eliades*, 113 Nev. 586, 589-90 (1997) ("To maintain the suit of another is now, and always has been, held to be unlawful, unless the person maintaining has some interest in the subject of the suit." (quoting *Lum* v. *Stinnett*, 87 Nev. 402, 408 (1971))); *Vosburg Equip.* v. *Zupancic*, 103 Nev. 266, 268 (1987) ("In 1890 this court held that even in the absence of statute it was, under the common law of England, unlawful to 'maintain the suit of

Within this framework, Neary's attempted assignment to Plaintiff constitutes champerty and is thus void. *See Semi-Tech Litig., LLC* v. *Bankers Tr. Co.*, 272 F. Supp. 2d 319, 331 (S.D.N.Y. 2003) ("[A]n assignment made in violation of [the champerty] statute is void and may not be sued upon." (collecting cases)). Neary's purpose — to allow Plaintiff to prosecute this case to obtain a money judgment — is clear from the face of the document by which he attempted to assign his rights to Plaintiff: "If [Plaintiff] sends Rio Secco any correspondence or legal or other type of document or document requests, Rio Secco may treat him as if he were me. *That is the purpose of this assignment*[.]" (Neary Assignment 1 (emphasis added)). That same document provides that Plaintiff also agreed to "go back to the course to further investigate" and that Neary sought to transfer his rights because he "did not want to be further upset and distracted with such a drastic and misleading event." (*Id.*). These portions of the purported assignment make plain that the purpose of the assignment was to allow Plaintiff to prepare and file a lawsuit seeking to obtain the funds to which Plaintiff claims Neary is entitled.

The allegations in the Amended Complaint further support the conclusion that Neary only attempted to assign his rights to Plaintiff so that Plaintiff, rather than Neary, could file suit. Indeed, Plaintiff acknowledges that he pursued this litigation "because [Neary] has [two] young children, and [due to] the stress of his career, and the anxiety, annoyance, frustration and upset

---

another' unless the person maintaining the suit 'has some interest in the subject of the suit.'" (quoting *Gruber* v. *Baker*, 20 Nev. 453, 469 (1890))).

caused by these events, [he] decided to extricate himself from these events and assign in totality to [Plaintiff] Neary's interests in this debt." (Am. Compl. ¶ 218). This desire to avoid "anxiety, annoyance, [and] frustration" — predictable responses to litigation — confirms that the design of the assignment was to allow Plaintiff to bring this action in place of Neary. *Cf. Justinian Capital SPC*, 28 N.Y.3d at 167 (holding assignment of notes was champertous where its "impetus ... was [the assignee's] desire to sue [defendant] for causing the notes' decline in value and not be named as the plaintiff in the lawsuit").

Given the Court's conclusion that Plaintiff's alleged oral contract with Neary is void for lack of consideration, Plaintiff cannot stake a preexisting interest in any claim that Neary may have had against Defendants in an effort to validate the assignment. *See Love Funding Corp.*, 13 N.Y.3d at 195. Thus, Neary's purported assignment to Plaintiff is void for violating the prohibition on champerty. *See Semi-Tech Litig., LLC*, 272 F. Supp. 2d at 331. More fundamentally, Plaintiff cannot allege a valid contractual relationship with Defendants on which to premise a breach of contract claim.

## C.    Plaintiff's Tort Claims Fail

As discussed above, Plaintiff alleges the following claims sounding in tort: (i) fraud, "occur[ring] on January 31, 2016 when the Rio Secco employee advised the Plaintiff, [Neary,] and their group that entering the [Hole-in-One Contest] and paying the $20 entry fee would get the golfer the one million-dollar prize should they get a hole in one" (Am. Compl. ¶ 244);

(ii) negligence, "consist[ing] of improperly training and supervising [Rio Secco] employees and giving inaccurate information to the public and to the Plaintiff, and carelessly marketing the million-dollar challenge" (*id.* at ¶ 279); and (iii) "intentional and material misrepresentations" consisting of the statement "that a hole-in-one got the Plaintiff and [Neary] a one million-dollar prize" (*id.* at ¶¶ 314-15). Tellingly, Plaintiff does not seek damages for any injury to his person or property, but rather compensatory damages for "the one million-dollar prize" and, for the fraud claim, punitive damages. (*Id.* at 45). Indeed, Plaintiff expressly disclaims any liability Defendants may have for the $20 entry fee Plaintiff paid. (*See id.* at ¶ 74 ("The Plaintiff [] is not suing for the return of his $20[.]"). Plaintiff's tort claims fail because they are duplicative of his contract claim, and, further, because the negligence claim is barred under the economic loss doctrine.

### 1. Plaintiff's Tort Claims Are Duplicative of His Contract Claim

"Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated." *Bayerische Landesbank, N.Y. Branch* v. *Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012). "Such a 'legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract.'" *Id.* (quoting *Clark-Fitzpatrick* v. *Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)). In consequence, where a plaintiff pleads a tort claim in addition to a contract claim and the tort claim seeks the same benefit sought under the contract claim, the tort claim

becomes duplicative of the contract claim and may not stand. *See id.* (citing *N.Y. Univ.* v. *Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995) ("[W]here a party is merely seeking to enforce its bargain, a tort claim will not lie." (internal citations omitted))).

Plaintiff's fraud and intentional misrepresentation claims are duplicative of his contract claim. As an initial matter, the Court shall consider these claims as a single cause of action, for under New York law, fraud and intentional misrepresentation are identical, and these claims are thus duplicative. *See Assoun* v. *Assoun*, No. 14 Civ. 1368 (PAC), 2015 WL 110106, at *5 (S.D.N.Y. Jan. 7, 2015) ("[Plaintiff] alleges a claim for intentional misrepresentation, which, under New York law, is identical to a claim for fraud." (collecting cases)); *Nwagboli* v. *Teamwork Transp. Corp.*, No. 08 Civ. 4562 (JGK)(KNF), 2009 WL 4797777, at *6 (S.D.N.Y. Dec. 7, 2009) (same).

Where, as here, a fraud claim is based on the "allegation that a party has made a contractual promise with no intention of performing it," it may be "sufficient to support an action for fraud, even where that statement relates to an agreement between the parties." *VTech Holdings Ltd.* v. *Lucent Techs., Inc.*, 172 F. Supp. 2d 435, 440 (S.D.N.Y. 2001) (quoting *Graubard Mollen Dannett & Horowitz* v. *Moskovitz*, 86 N.Y.2d 112, 122 (1995)). For such a claim to proceed, it must either "(i) demonstrate a legal duty separate from the duty to perform under the contract; ... (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."

*Bridgestone/Firestone, Inc.* v. *Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).

Distilled to its essence, Plaintiff's fraud claim contends that, having been assigned Neary's right to collect on the hole-in-one, Plaintiff is entitled to the million-dollar prize because Defendants misrepresented the terms of the Contest as requiring only one successful hole-in-one to win. But given Plaintiff's pursuit of the prize money, as opposed to the money he paid to enter the Contest, his theory of fraud implicitly relies on (i) the alleged promise of $1 million for a successful hole-in-one and (ii) Defendants' failure to pay such prize. Plaintiff's fraud claim is therefore substantively identical to his contract claim and, indeed, seeks exactly the same damages. *See, e.g.*, *TN Metro Holdings I, LLC* v. *Commonwealth Ins. Co.*, 51 F. Supp. 3d 405, 410-12 (S.D.N.Y. 2014) (dismissing fraud claim as duplicative where it sought same relief as contract claim); *Page* v. *Muze, Inc.*, 705 N.Y.S.2d 383, 384 (2d Dep't 2000) (dismissing fraud claims that "allege[d], in essence, that the defendants promised to give the plaintiff an equity interest in the company and reneged on that promise").

A fraud claim alleging that a plaintiff entered a contract in reliance on misrepresentations may be distinct from a cause of action claiming breach of the underlying contract — for example, where the fraud claim alleges that a defendant breached a duty distinct from its contractual duties. *See Alpha Capital Anstalt* v. *Oxysure Sys., Inc.*, 252 F. Supp. 3d 332, 340 (S.D.N.Y. 2017). To that end, Plaintiff here alleges that "false information" "entic[ed him] to enter

into the fraudulent contest." (Am. Compl. ¶ 255). But Plaintiff expressly disclaims the damages that he would have suffered *in reliance* on such a misstatement, namely, the $20 entry fee. *Cf. VTech Holdings Ltd.*, 172 F. Supp. 2d at 440 (holding fraud claim was distinct from contract claim where it alleged representations induced plaintiff to enter contract and expenditures made in reliance on representations). In other words, the $1 million prize Plaintiff now seeks belies any notion that Plaintiff's fraud claim is based on extracontractual duties.

Plaintiff's negligence claim fares no better. The Amended Complaint does not identify a specific duty owed to Plaintiff, but merely alleges that "Defendants owed a duty to the Plaintiff and [Neary] and breached this duty by giving insufficient and/or inaccurate information to the Plaintiff." (Am. Comp. ¶ 280). The Court thus assumes that the duty on which Plaintiff bases his negligence claim would require Defendants to train employees to communicate accurately the terms of the Hole-in-One Contest to patrons. But even assuming Defendants had such a duty, it would be inextricably tied to the terms of the alleged contract between Defendants and Neary. *See Fixed Income Shares: Series M* v. *Citibank N.A.*, 130 F. Supp. 3d 842, 857 (S.D.N.Y. 2015) (dismissing negligence claim as duplicative of contract claim where "alleged deficiencies [were] essentially the same ones that g[a]ve rise to" the contract claim); *Clarendon Nat'l Ins. Co.* v. *Health Plan Administrators*, No. 08 Civ. 6279 (GBD), 2009 WL 3053736, at *4 (S.D.N.Y. Sept. 24, 2009) ("If a plaintiff alleges acts or omissions that are based solely on provisions of a contract, their

negligence claim must fail as duplicative." (citing *Metro. W. Asset Mgmt., LLC* v. *Magnus Funding, Ltd.*, No. 03 Civ. 5539 (NRB), 2004 WL 1444868, at *26 (S.D.N.Y. June 25, 2004)).  Indeed, Plaintiff would be hard-pressed to identify a duty requiring Defendants to communicate accurately (or to train their employees to so communicate) the terms of the Contest without relying on those same terms.  *Cf. Waverly Properties, LLC* v. *KMG Waverly, LLC*, 824 F. Supp. 2d 547, 565 (S.D.N.Y. 2011) (upholding negligence claim as non-duplicative where it alleged independent legal duty to comply with municipal construction codes).  And the similitude of these claims is underscored, yet again, by Plaintiff's pursuit of the $1 million prize rather than any other damages resulting from Defendants' alleged negligence.  *See Clarendon Nat'l Ins. Co.*, 2009 WL 3053736, at *4 (dismissing negligence claim as duplicative that sought "the same amount of damages" as contract claim).[10]

### 2.    The Economic Loss Doctrine Bars Plaintiff's Negligence Claim

Plaintiff's negligence claim also fails under New York's economic loss doctrine.[11]  That doctrine provides that "where plaintiffs allege primarily

---

[10]    The outcome would be no different under Nevada law, which prohibits the assignment of both fraud and negligence claims. *Achrem* v. *Expressway Plaza Ltd. P'ship*, 112 Nev. 737, 739-40 (1996) (discussing prohibition on assignments of tort claims as opposed to proceeds thereof); *Prosky* v. *Clark*, 32 Nev. 441 (1910) ("Rights of action based on fraud … are … not assignable, but are personal to the one defrauded.").

[11]    Courts in this District have held that New York's economic loss doctrine does not apply to intentional torts such as fraud.  *See Weisblum* v. *Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 297 (S.D.N.Y. 2015).  And Nevada courts apply the economic loss doctrine in a similar fashion.  *See Davis* v. *Beling*, 128 Nev. 301, 320 (2012) (providing that economic loss doctrine bars "recovery of purely monetary losses in certain products liability and unintentional tort actions" but does not bar such recovery where "the defendant intentionally breaches a duty that is imposed independently of the obligations arising from contract"); *Terracon Consultants W., Inc.* v. *Mandalay Resort Grp.*, 125 Nev. 66, 73 (2009) ("[T]he [economic loss] doctrine bars unintentional tort actions when the plaintiff seeks to recover 'purely economic losses.'").

economic loss as an injury in a tort claim, 'the usual means of redress is an action for breach of contract; a tort action for economic loss will not lie.'" *BNP Paribas Mortg. Corp.* v. *Bank of Am., N.A.*, 949 F. Supp. 2d 486, 505-06 (S.D.N.Y. 2013) (quoting *In re Adelphia Communications Corp.*, No. 02-41729, 2007 WL 2403553, at *9 (Bankr. S.D.N.Y. Aug. 17, 2007)). "Under this principle, the defendant is not liable to a plaintiff for the latter's economic loss unless there exists 'a special relationship that requires the defendant to protect against the risk of harm to plaintiff.'" *Travelers Cas. & Sur. Co.* v. *Dormitory Auth.-State of N.Y.*, 734 F. Supp. 2d 368, 378 (S.D.N.Y. 2010) (quoting *532 Madison Ave. Gourmet Foods, Inc.* v. *Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 289 (2001)). "Professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties. In these instances, it is policy, not the parties' contract, that gives rise to a duty of due care." *Sommer* v. *Fed. Signal Corp.*, 79 N.Y.2d 540, 551-52 (1992) (internal citations omitted).

Here, the application of the economic loss doctrine is clear: Plaintiff does not seek damages for injuries to his person or property, but for an alleged injury that is quintessentially economic. *See Netzer* v. *Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1320 (S.D.N.Y. 1997) ("[Plaintiff]'s action seeks recovery for economic loss, not for injury to his person or damage to his property, and thus [Plaintiff] has no tort action relating to the performance of the alleged contract."). Plaintiff claims expectancy damages, *i.e.*, the amount Plaintiff expected to profit through Neary's hole-in-one and attempted

assignment, which is a form of damages that falls squarely within the economic loss doctrine. *Travelers Cas. & Sur. Co.*, 734 F. Supp. 2d at 378 ("[T]o the extent that a plaintiff claiming economic damages is seeking to recover the loss of an expectancy interest created by contract in the first instance, the doctrine channels the dispute into a breach-of-contract action[.]").

Thus, the economic loss doctrine provides an additional basis to dismiss Plaintiff's negligence claim.

## D.    Plaintiff's Intentional Interference Claim Fails

Plaintiff's final cause of action claims that Defendants' attorney "tortious[ly] interfer[ed]" with the alleged assignment between Neary and Plaintiff by attempting to offer Neary "an all expense paid trip to Las Vegas for [two] people, and for [Neary] to hit [three] shots at the [seventh] green, and to possibly win $1 million [] with a [second] hole in one." (Am. Compl. ¶¶ 352, 357-58). The Court need not belabor why this claim fails.

"Tortious interference with contract requires the existence of a *valid contract* between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, *actual breach of the contract,* and damages resulting therefrom." *Lama Holding Co.* v. *Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996) (emphases added) (citing *Israel* v. *Wood Dolson Co.*, 1 N.Y.2d 116, 120 (1956)). As discussed above, Neary's purported assignment to Plaintiff is void, thus thwarting Plaintiff's tortious interference claim. In addition, Plaintiff

does not allege that Neary breached the alleged assignment.  This claim is therefore dismissed.

**E.  Plaintiff Is Not Entitled to Injunctive Relief**

Plaintiff seeks injunctive relief as an independent cause of action.  (*See* Am. Compl. ¶ 323 ("This cause of action is for injunctive relief against the Defendants[.]")).  To begin, "injunctions are remedies, not causes of action." *Messinger* v. *JPMorgan Chase Bank, N.A.*, No. 13 Civ. 2444 (AJN), 2014 WL 904528, at *2 (S.D.N.Y. Mar. 7, 2014) (quoting *Chiste* v. *Hotels.com L.P.,* 756 F. Supp. 2d 382, 406 (S.D.N.Y. 2010)).  And whether Plaintiff is pursuing preliminary or permanent injunctive relief (the pleadings are unclear), he is not entitled to such remedy because all of his claims fail on the merits.  *See Amoco Prod. Co.* v. *Vill. of Gambell, AK*, 480 U.S. 531, 545 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

**F.  The Court Shall Not Grant Leave to Amend *Sua Sponte***

Plaintiff has not requested leave to amend his complaint a second time, and the Court sees no compelling reason to grant such leave *sua sponte*. "While leave to amend under the Federal Rules of Civil Procedure is 'freely granted,' no court can be said to have erred in failing to grant a request that was not made."  *Gallop* v. *Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (internal citation omitted).  In addition, "[a] plaintiff need not be given leave to amend if it fails to specify … how amendment would cure the pleading deficiencies in its

complaint." *TechnoMarine SA* v. *Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

Plaintiff has already had one attempt to amend his pleadings to state valid claims. More importantly, given the foregoing reasoning, any further amendment would be futile, thus providing a basis to deny a request for amendment had Plaintiff so moved. *See, e.g.*, *Cuoco* v. *Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (affirming denial of motion to amend where complaint's deficiencies were "substantive" and thus repleading was futile); *United States ex rel. Tessler* v. *City of New York*, No. 14 Civ. 6455 (JMF), 2016 WL 7335654, at *5 (S.D.N.Y. Dec. 16, 2016) (refusing to grant leave to amend *sua sponte* where amendment would be futile), *aff'd*, No. 17-178-cv, 2017 WL 4457141 (2d Cir. Oct. 5, 2017). In any event, Plaintiff has not proposed a second amended complaint or otherwise indicated that he possesses facts that could cure the deficiencies identified above. *See, e.g.*, *Transeo S.A.R.L.* v. *Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415-16 (S.D.N.Y. 2013); *Preira* v. *Bancorp Bank*, 885 F. Supp. 2d 672, 681 (S.D.N.Y. 2012). Accordingly, the Court declines to grant Plaintiff leave to amend his complaint once more.

## CONCLUSION

Given the foregoing, the Amended Complaint is DISMISSED WITH PREJUDICE as to Defendants Caesars Entertainment Corporation, incorrectly named as "Caesars Entertainment"; Caesars Entertainment Operating Company; Desert Palace, Inc., doing business as Caesars Palace; and Rio Development Company, incorrectly named as Rio Secco Golf Club. In addition,

Plaintiff is ORDERED TO SHOW CAUSE, on or before **Friday, March 9, 2018**, why the Amended Complaint should not be dismissed without prejudice as to Defendants Butch Harmon, Millionaire Maker, and Nike Golf for failure to serve within the time frame specified by Federal Rule of Civil Procedure 4(m).

      SO ORDERED.

Dated:      February 23, 2018
            New York, New York

_____
      KATHERINE POLK FAILLA
      United States District Judge